JULIA M. JAYNE (State Bar No. 202753)
ASHLEY RISER (State Bar No. 320538)
Email: julia@jaynelawgroup.com
Email: ashley@jaynelawgroup.com
JAYNE LAW GROUP, P.C.
483 9th Street, Suite 200
Oakland, California 94607
Telephone: (415) 623-3600

Attorneys for Defendant MARCUS BELTON

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　Plaintiff,<br><br>v.<br><br>MARCUS BELTON,<br><br>　　　Defendant. | Case No. CR 14-030 JST<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I) AND REQUEST FOR IMMEDIATE RELEASE BECAUSE OF HEIGHTENED RISK FOR COVID-19** |

　　　MARCUS BELTON moves this Court for an order to move Mr. Belton to home confinement because of the "extraordinary and compelling reasons" discussed below, under 18 U.S.C. § 3582(c)(1)(A)(i). Because of the coronavirus pandemic, which prompts his requested relief, Mr. Belton's motion can and should be handled without oral argument and on an expedited basis to save his life.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i
INTRODUCTION .............................................................................................................. 1
PROCEDURAL BACKGROUND ..................................................................................... 2
ARGUMENT ...................................................................................................................... 2
   I.   MR. BELTON'S CONTINUED INCARCERATION WITHIN THE BUREAU OF PRISONS POSES GRAVE DANGERS TO HIS HEALTH AND TO THE HEALTH OF OTHER INMATES AND STAFF. ........ 2
      A.   The Attorney General Expanded the Cohort of Inmates Eligible for Early Release. .................................................................................................... 2
      B.   USP Lompoc's Infrastructure Limits Its Ability to Implement CDC Guidelines. 4
   II.   MR. BELTON'S UNIQUE COMBINATION OF MEDICAL CONDITIONS CONSTITUTE "EXTRAORDINARY AND COMPELLING" REASONS FOR RELEASE. ............ 6
      A.   Mr. Belton is at Significant Risk of Death from Coronavirus Because of His Many Medical Issues and Weakened Physical State. .................... 6
         1.   Mr. Belton's Medical Conditions Make Him Particularly Susceptible to Injury or Death from COVID-19. ............................................................ 6
         2.   People Can Contract Coronavirus Multiple Times. .................................. 7
         3.   The Long-Term Consequences of COVID-19. ........................................ 7
         4.   Compassionate Release is Necessary to Avoid Lethal Consequences. .... 8
      B.   Mr. Belton Has an Excellent Release Plan. ............................................. 9
   III.   THE COURT HAS JURISDICTION TO REDUCE THE SENTENCE. ..... 10
      A.   Statutory Framework for Sentence Reduction Authority under 18 U.S.C § 3582(C)(1)(a)(i). ..................................................................................... 10
      B.   The Court Can Consider Mr. Belton's Motion Because the Warden Did Not Respond to Mr. Belton's Request in 30 Days. .................................. 10
      C.   Mr. Belton's Vulnerability to COVID-19 Is an Extraordinary and Compelling Reason. .................................................................................. 11
      D.   The Remaining Section 3553 Factors Favor Release. ............................ 12
         1.   Rehabilitation, Educational, and Vocational Opportunities .................. 13
         2.   Changes to Draconian Sentencing Schemes Constitute Compelling and Extraordinary Reasons ............................................................................ 14
REQUEST FOR IMMEDIATE RELEASE ..................................................................... 14
CONCLUSION ................................................................................................................. 15

LAW OFFICES
JAYNE LAW GROUP, P.C.
483 9TH STREET, SUITE 200
OAKLAND, CALIFORNIA 94607

# TABLE OF AUTHORITIES

<u>Cases</u>

| | |
|---|---|
| *Pepper v. United States*, 562 U.S. 476 (2011) | 12 |
| *Thakker v. Doll*, Case No. 20-cv-480-JEJ (M.D. Pa. Mar. 31, 2020) | 4 |
| *United States v. Arreola-Brteado*, 445 F. Supp. 3d 1154 (S.D. Cal. 2020 | 12 |
| *United States v. Burrill*, 445 F. Supp. 3d 22 (N.D. Cal. 2020) | 4 |
| *United States v. Daniels*, 2020 WL 1815342 (N.D. Cal. Apr. 9, 2020) | 4 |
| *United States v. Graham,* 2020 WL 5604050 (S.D.N.Y. Sept. 17, 2020) | 8 |
| *United States v. Jackson*, No. 18-CR-5477-GPC (S.D. Cal. June 22, 2020) | 6 |
| *United States v. McCall*, 2020 WL 2992197 (M.D. Ala. June 4, 2020) | 9 |
| *United States v. Quinn*, 2020 WL 3275736 (N.D. Cal. June 17, 2020 | 14 |
| *United States v. Resnick*, 451 F. Supp. 3d 262 (S.D.N.Y. 2020) | 11 |
| *United States v. Sholler*, 445 F. Supp. 3d 265 (N.D. Cal. May 2020 | 9 |
| *United States v. Stephenson*, 2020 WL 2566760 (S.D. Iowa May 21, 2020) | 6, 11 |
| *United States v. Watson*, 2020 WL 4251802 (D. Nev. July 22, 2020) | 8 |
| *United States v. Yellin*, 2020 WL 3488738 (S.D. Cal. June 26, 2020) | 6, 8 |

<u>Statutes</u>

| | |
|---|---|
| 18 U.S.C. § 3582 | 10, 12 |
| 18 U.S.C. § 924(e)(2) | 14 |
| First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 | 10 |

<u>Other Authorities</u>

| | |
|---|---|
| Carolyn Barber, *COVID-19 Can Wreck Your Heart, Even if You Haven't Had Any Symptoms*, Scientific American | 8 |
| *Certain Medical Conditions and Risk for Severe COVID-19 Illness*, Centers for Disease Control | 1, 6, 11 |
| Chad Terhune, et al, *Why COVID-19 is killing U.S. diabetes patients at alarming rates*, Reuters | 1 |
| Debra Herrick, *260 cases of Covid-19 in Santa Barbara County / Lompoc prison outbreak grows* | 4 |
| Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) | |

Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337 ............................................................ 2

Fed. Bureau of Prisons, *Find an Inmate* ..................................................................................... 2

Heidi Ledford, *Coronavirus reinfections: three questions scientists are asking*, Nature ........... 7

Jennifer Couzin-Frankel, *From 'brain fog' to heart damage, COVID-19's lingering problems alarm scientists*, Science ............................................................................................................ 7

Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047-155 (2007) ........................................................................................................................................... 4

Kelly Servick, *For survivors of severe COVID-19, beating the virus is just the beginning*, Science ........................................................................................................................................ 7

*Longitudinal evaluation and decline of antibody responses in SARS-CoV-2 infection*, medRxiv ..... 7

Memorandum from Att'y Gen. William Barr to Director of BOP on Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020) ................................ 3

Memorandum from Att'y Gen. William Barr to Director of BOP on Prioritization of Home Confinement as Appropriate Response to COVID-19 Pandemic (Mar. 26, 2020) ................... 3

Office of the Inspector Gen., U.S. Dep't Of Justice, *Pandemic Response Report July 2020, Remote Inspection of Federal Correctional Complex Lompoc*, Report 20-086 ................... 3, 4, 13

Office of the Inspector Gen., U.S. Dep't Of Justice, *Review Of The Federal Bureau Of Prisons' Medical Staffing Challenges* (2016) ........................................................................................ 11

U.S. Bureau of Prisons, Program Statement 5050.50, *Compassionate Release Procedures* 3 (Jan. 17, 2019) .................................................................................................................................... 2

**INTRODUCTION**

Marcus Belton has flirted with death a few times: in 1998, he was shot, and a few years ago, he tumbled down a flight of stairs. But it was only this year, laying in a hospital bed, that Mr. Belton truly believed he was going to die. He was in the hospital, an oxygen tube in his nose, when the reality of the coronavirus pandemic hit him. Even before he was rushed to Lompoc Valley Medical Center, he knew that COVID was potentially lethal for someone like him – according to the Centers for Disease Control, Mr. Belton is at an increased risk of severe illness or death from the coronavirus because he has Type 2 diabetes, chronic kidney issues, and hypertension.[1]

Initially, Mr. Belton's wife, Krystal Sipp Glenn, did not worry. The reason? No one told her that her husband was in the hospital with COVID.[2] It was only after a fellow inmate's wife called her that she learned her husband had left the prison because he was sick. When Krystal then called FCI Lompoc, she "got no answer about where he was, or anything about Marcus catching Covid 19."[3] Despite repeatedly calling, Krystal and Mr. Belton's mother, Jo Eva Wiggins-Wellington, did not hear from Mr. Belton. They only learned that Mr. Belton had tested positive for coronavirus and was hospitalized when he was allowed to call home – several weeks later.[4]

Since Mr. Belton returned to Lompoc, he's lived in fear that he will end up in the hospital again and this time, he won't make it. After all, "nearly 40% of people who have died with COVID-19 had diabetes."[5] This anxiety was only heightened when Mr. Belton started experiencing COVID symptoms again. On September 25, 2020, he emailed counsel because his breathing "is bad now" and he was experiencing "cheast [sic] pains and coughing."[6] When he

---

[1] *Certain Medical Conditions and Risk for Severe COVID-19 Illness* ("Risk for Severe COVID-19 Illness"), Centers for Disease Control (Sep. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
[2] *See* Declaration of Ashley Riser ("Riser Decl."), Ex. G, Email from Krystal Sipp.
[3] *See* Riser Decl., Ex. G.
[4] *See* Riser Decl., Ex. G.
[5] Chad Terhune, et al, *Why COVID-19 is killing U.S. diabetes patients at alarming rates*, Reuters (Jul. 24, 2020), https://www.reuters.com/article/us-health-coronavirus-diabetes-insight-idUSKCN24P1B4.
[6] *See* Riser Decl., Ex. E, Email from Marcus Belton.

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

1

contacted Lompoc's medical unit to apprise them of his symptoms, he was threatened with a write-up.[7]

## PROCEDURAL BACKGROUND

Mr. Belton was sentenced to 240 months of prison on November 23, 2015 after being found guilty of violations of 18 U.S.C. 922(g), 21 U.S.C. 860, and 18 U.S.C. 924(c). He is serving his sentence at FCC Lompoc, and his estimated release date is May 9, 2031.[8]

In July 2020, Mr. Belton submitted a written request to the BOP for compassionate release. He followed-up with another written request, asking, "why [he is] being denied by my unit team for review under 3582, for home confinement."[9] In addition, Mr. Belton, through counsel, requested confirmation several times that the BOP received his requests, but never received a response. On August 18, 2020, Mr. Belton, through counsel, requested compassionate release again.[10] This time, the warden of Lompoc acknowledged receipt of the letter but did not respond within 30 days. Later, on September 24, 2020, Mr. Belton received a denial.[11]

## ARGUMENT

**I. MR. BELTON'S CONTINUED INCARCERATION WITHIN THE BUREAU OF PRISONS POSES GRAVE DANGERS TO HIS HEALTH AND TO THE HEALTH OF OTHER INMATES AND STAFF.**

**A. The Attorney General Expanded the Cohort of Inmates Eligible for Early Release.**

In early March, President Trump declared the COVID-19 outbreak a national emergency.[12] Given the pandemic, and the likelihood that some inmates would be safer serving their sentences at home than in BOP facilities, the Attorney General directed the BOP to prioritize the use of

---

[7] *See* Riser Decl.
[8] Fed. Bureau of Prisons, *Find an Inmate* (Aug. 14, 2020), https://www.bop.gov/inmateloc.
[9] Dkt. 335, p. 2.
[10] *See* Riser Decl., Ex. C, Letter to Warden of Lompoc; *see also* U.S. Bureau of Prisons, Program Statement 5050.50, *Compassionate Release Procedures* 3 (Jan. 17, 2019), https://www.bop.gov/progstat/5050_050_EN.pdf. ("The Bureau of Prisons processes a request made by another person on behalf of an inmate in the same manner as an inmate's request.")
[11] *See* Riser Decl.
[12] Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak.

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST
2

existing statutory authorities to transfer to home confinement at-risk inmates who are non-violent and pose minimal likelihood of recidivism.[13]

Congress then enacted the CARES Act. Section 12003(b)(2) of the Act provides "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director … may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement..." The Attorney General then made the finding that emergency conditions materially affected the functioning of the BOP.[14] This finding "expanded the cohort of inmates who can be considered for home release."  Because the Attorney General made this finding under the CARES Act, the BOP Director may now review all inmates for home confinement and "not only those who were previously eligible for a transfer." Attorney General Barr also explained that "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations."

Mr. Belton is at a prison where COVID-19 is "materially affecting their operations."[15] He suffers from Type 2 diabetes, chronic kidney disease, essential hypertension, secondary hypertension, and a host of other serious medical conditions. Finally, he has an excellent home confinement plan: he will live with his mother and wife in his mother's Oakland duplex. While living in Oakland, he will have access to medical treatment, and he will be able to quarantine and socially distance. In sum, he is an ideal candidate for home confinement, which will minimize his risk of contracting the virus and being hospitalized.

---

[13] Memorandum from Att'y Gen. William Barr to Director of BOP on Prioritization of Home Confinement as Appropriate Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.justice.gov/file/1262731/download.
[14] Memorandum from Att'y Gen. William Barr to Director of BOP on Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.
[15] Office of the Inspector Gen., U.S. Dep't Of Justice, *Pandemic Response Report July 2020, Remote Inspection of Federal Correctional Complex Lompoc*, Report 20-086 ("Pandemic Report") (Jul. 23, 2020), https://oig.justice.gov/sites/default/files/reports/20-086_0.pdf. ("… the Attorney General had directed the BOP to 'immediately maximize appropriate transfers to home confinement of all appropriate inmates' at prisons, like Lompoc, 'where COVID-19 is materially affecting operations.'").

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

### B. USP Lompoc's Infrastructure Limits Its Ability to Implement CDC Guidelines.

"Social distancing and proper hygiene are the only effective means by which we can stop the spread of COVID-19," but jails and prisons ensure that these precautions are "difficult, if not impossible" to undertake.[16] The reason for this is that the "probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise."[17] Because of these conditions, "incarcerated individuals, as well as society as a whole, are safer the more defendants are released."[18]

Lompoc is particularly susceptible to these issues. As the Office of the Inspector General explained, Lompoc's "infrastructure may have limited its ability to implement the CDC's social distancing guidelines. FCC Lompoc has open bar cells (as opposed to solid doors), and inmates congregate in common areas, which can facilitate rapid community spread."[19] For example, to watch TV, inmates stand at the front of their cells, "literally trying to get their head trought [sic] the door… or they stand there yelling to other men, spittle flying, ear drums being rung by the yelling straight into your ear as you walk by."[20] For these reasons, it is not surprising that Lompoc was once described as the country's "largest hotspot for the virus."[21]

In response, Lompoc "escalated its restrictions through a lockdown" in late April.[22] "During the lockdown, approximately 1,000 USP inmates did not have access to showers."[23] Lompoc officials later told the Inspector General that "to address inmates' hygienic needs, staff

---

[16] *United States v. Daniels*, 2020 WL 1815342, at *3 (N.D. Cal. Apr. 9, 2020) (quoting *Thakker v. Doll*, Case No. 20-cv-480-JEJ (M.D. Pa. Mar. 31, 2020)).
[17] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047-155 (2007), https://doi.org/10.1086/521910.
[18] *United States v. Burrill*, 445 F. Supp. 3d 22, 27 (N.D. Cal. 2020).
[19] Pandemic Report, *supra*.
[20] *See* Riser Decl. Ex. F, Declaration of Marcus Belton.
[21] Debra Herrick, *260 cases of Covid-19 in Santa Barbara County / Lompoc prison outbreak grows* (Apr. 11, 2020), http://www.coastalview.com/coronavirus_resources/260-cases-of-covid-19-in-santa-barbara-county-lompoc-prison-outbreak-grows/article_7159bbe4-7c09-11ea-8161-4317f1f7adae.html.
[22] "[D]uring the lockdown, inmates were confined to their cells for 24 hours a day without recreation, which is more restrictive than conventional Special Housing Unit (SHU) placement." Pandemic Report, *supra*.
[23] *Id*.

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

4

members provided inmates with multiple hygiene kits that contained a razor, a toothbrush, toothpaste, and soap bars so inmates could wash themselves at the sink in their cell." Yet, "36 percent … of Lompoc staff … reported that more personal hygiene supplies, including soap and hand sanitizers, was an immediate need for inmates." Staff also told the Inspector General "that more hygiene supplies for staff was an immediate need."[24]

Despite the Inspector General's report, Lompoc continues to put people's lives at risks by not implementing basic CDC guidelines. In a September 21, 2020 declaration, Mr. Belton reported that "staff and inmates regualary [sic] are observed without coverings and I am unaware of any staff or inmates being disciplined or sanctioned for not wearing a mask."[25] As such, it "is impossible to remain safe or socially distance oneself..." He continued, explaining that it is not possible to "avoid conflict and contagion by creating distance between these people." In sum, "[n]owhere to go; can't get away from them."[26]

Unfortunately, Lompoc has failed in other areas, too, including poorly ventilated showers and inadequate phone sanitization. Because "there is no ventilation inside the shower area[,] [t]he celings [sic] drips with large water droplets due to 100% constant humidity."[27] As a result, "[t]here is black mold on the walls, ceiling and shower curtains."[28] When inmates use the phone, they act "like nervous hyenas foraging on a carcus [sic] after going without food."[29] This means that social distancing is impossible, which is particularly problematic because the "phones are not sanitized after use and are not wiped down after every use."[30] Undoubtedly, for someone with numerous medical conditions such as Mr. Belton, this environment is placing his life at risk every single day.

---

[24] *Id*.
[25] *See* Riser Decl. Ex. F, Declaration of Marcus Belton.
[26] *Id*.
[27] *Id*.
[28] *Id*.
[29] *Id*.
[30] *Id*.

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

5

II.  **MR. BELTON'S UNIQUE COMBINATION OF MEDICAL CONDITIONS CONSTITUTE "EXTRAORDINARY AND COMPELLING" REASONS FOR RELEASE.**

    A.  **Mr. Belton is at Significant Risk of Death from Coronavirus Because of His Many Medical Issues and Weakened Physical State.**

Courts granting compassionate release have acknowledged that certain medical conditions, such as Type 2 diabetes, "diminish the body's ability to put forth an adequate immune response to the virus."[31] Stated another way, the body's ability to fend off the disease is weakened by certain health conditions, including chronic kidney disease, Type 2 diabetes mellitus, obesity, and hypertension.[32] Appreciating this, "several courts have cited a weakened immune system as a basis for granting compassionate release."[33]

In early April, Mr. Belton was hospitalized after contracting COVID-19.[34] Because of his medical conditions, the long-term consequences of coronavirus, and the potentially lethal consequences of reinfection, Mr. Belton should be granted compassionate release and permitted to serve the remainder of his sentence on home confinement.

    1.  <u>Mr. Belton's Medical Conditions Make Him Particularly Susceptible to Injury or Death from COVID-19.</u>

At 48 years old, Mr. Belton suffers from:

- Chronic kidney disease
- Type 2 Diabetes
- Gastro-esophageal reflux disease
- High Cholesterol
- Essential and secondary hypertension

Further, Mr. Belton uses a walker and is permanently disabled after a 1998 shooting. Because of these conditions, he previously received full SSI benefits.[35]

In addition, Mr. Belton has sciatic nerve damage from a 2017 fall in USP Victorville.[36]

---

[31] *United States v. Yellin*, 2020 WL 3488738, at *1 (S.D. Cal. June 26, 2020) (citing *United States v. Jackson*, No. 18-CR-5477-GPC (S.D. Cal. June 22, 2020) (describing immunosuppression for patients with Type-2 diabetes in the context of COVID-19)).
[32] Risk for Severe COVID-19 Illness, *supra*.
[33] *United States v. Stephenson*, 2020 WL 2566760, at *5 (S.D. Iowa May 21, 2020)
[34] *See* Riser Decl., Ex. A, Medical Records; *see also* Riser Decl., Ex. G.
[35] *See* Riser Decl.
[36] *See* Riser Decl.

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

This occurred when the prison, against medical advice, housed Mr. Belton on the second floor of the prison. One day, Mr. Belton fell down a flight of stairs with his walker, therefore further injuring himself.[37]

### 2. People Can Contract Coronavirus Multiple Times.

Mr. Belton should be granted compassionate release because reinfection is possible.[38] Moreover, because of COVID's long-term effects on the lungs, heart, kidneys, and immune system, Mr. Belton is weaker than he was when he contracted the virus the first time. As discussed below, other courts have granted motions for compassionate release on these grounds.

Further, coronavirus immunity, if it exists, is believed to last for a short time.[39] If so, Mr. Belton – who was hospitalized in April – is no longer protected by his prior infection. In turn, Mr. Belton can get reinfected because he no longer enjoys the immunity afforded by his previous hospitalization. If his experience is any indication, another infection could send him to the hospital and eventually, the grave.

### 3. The Long-Term Consequences of COVID-19.

The coronavirus is thought of as a respiratory disease, but "COVID-19's immediate assault on the body is extensive."[40] So, while the virus "targets the lungs," it "can also damage the kidneys, liver, heart, brain, and other organs."[41] As a result, the "list of lingering maladies from COVID-19 is longer and more varied than most doctors could have imagined."[42] *Nature* Magazine recently catalogued some of these long-term consequences,[43] which include:

---

[37] *See* Riser Decl.
[38] Heidi Ledford, *Coronavirus reinfections: three questions scientists are asking*, Nature (Sep. 4, 2020), https://go.nature.com/3bH6mih.
[39] *Longitudinal evaluation and decline of antibody responses in SARS-CoV-2 infection*, medRxiv (Jul. 9, 2020), https://www.medrxiv.org/content/10.1101/2020.07.09.20148429v1.
[40] Kelly Servick, *For survivors of severe COVID-19, beating the virus is just the beginning*, Science (Apr. 8, 2020), https://www.sciencemag.org/news/2020/04/survivors-severe-covid-19-beating-virus-just-beginning.
[41] *Id.*
[42] Jennifer Couzin-Frankel, *From 'brain fog' to heart damage, COVID-19's lingering problems alarm scientists*, Science (Jul. 31, 2020), https://www.sciencemag.org/news/2020/07/brain-fog-heart-damage-covid-19-s-lingering-problems-alarm-scientists.
[43] Michael Marshall, *The lasting misery of coronavirus long-haulers*, Nature (Sept. 14, 2020), https://go.nature.com/3O9oTzo

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST
7

- Weakened immune system
- Heart damage, including cardiomyopathy[44]
- Chronic fatigue
- Lung damage
- Cognitive difficulties, such as confusion and memory loss

In fact, doctors have observed this damage in seemingly healthy people, such as college and professional athletes.[45] In comparison, Mr. Belton is not a young, healthy athlete: he suffers from several potentially deadly medical conditions, and he has already suffered the ravages of the disease one time. Since his hospitalization, Mr. Belton has exhibited many of these consequences: he still experiences shortness of breath, chest pain, a lingering cough, and low energy levels.[46] Despite these issues, Lompoc continues to ignore his requests for medical treatment. For example, on October 2, 2020, he was supposed to receive a breathing treatment for his ongoing breathing issues, but this did not happen.[47] Thus, Lompoc either does not have the resources or the consideration to treat inmates in need of regular medication attention. Mr. Belton's sentence was never intended to cause him to suffer such physical pain.

### 4.   Compassionate Release is Necessary to Avoid Lethal Consequences.

The government will likely claim that Mr. Belton should not be granted compassionate release because he has already suffered from and survived coronavirus.[48] However, several courts, including ones in this district, have resoundingly rejected this argument. For example, in *United States v. Yellin*, the Southern District of California granted the defendant's motion for compassionate release even though "his medical record states he recovered from COVID-19."[49]

---

[44] Cardiomyopathy occurs when "the muscles of the heart become stretched, stiff or thickened, affecting the heart's ability to pump blood." *Id.*

[45] *See e.g.*, Carolyn Barber, *COVID-19 Can Wreck Your Heart, Even if You Haven't Had Any Symptoms*, Scientific American (Aug. 31, 2020), https://www.scientificamerican.com/article/covid-19-can-wreck-your-heart-even-if-you-havent-had-any-symptoms/.

[46] *See* Riser Decl.

[47] *See* Riser Decl.

[48] *See e.g.*, *United States v. Watson*, 2020 WL 4251802, at *2 (D. Nev. July 22, 2020) ("The government counters that Defendant already contracted COVID and was asymptomatic, implying that he cannot be reinfected."; *see also United States v. Graham,* 2020 WL 5604050, at *3 (S.D.N.Y. Sept. 17, 2020) ("The Government also indicated Defendant has since recovered from COVID-19 and argued she may now have some degree of immunity to protect her from reinfection.").

[49] *Yellin* at *3 (S.D. Cal. June 26, 2020).

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

The court explained, "the possibility of reinfection persists."[50] Because he faced a "tremendous risk of deadly [re]infection from COVID-19," the court granted his motion "to avoid potentially lethal consequences."[51] This was done despite the fact that Mr. Yellin was "serving a 72-month sentence for distribution and receipt of child pornography."[52]

The *Yellin* court cited other similarly situated defendants, such as an inmate in Alabama granted compassionate release because their underlying medical conditions made "the risk of … reinfection unacceptable.[53] The defendant in that cited case, *McCall,* was granted compassionate release even though he began serving a 10-year sentence for possession with intent to distribute narcotics in March 2018.[54]

In a case out of the Northern District of California, the court granted a defendant's motion for compassionate release after considering his age and "numerous pre-existing conditions,"[55] including a COVID-19 diagnosis.[56] This case – *United States v. Sholler* – concerned a defendant convicted of "attempting to transfer obscene material to a minor, in violation of 18 U.S.C. § 1470." The defendant was sentenced to 90 months of prison in November 2018.[57] In modifying the defendant's sentence to time-served, the court rejected the government's argument that "that defendant would be at lower risk of reinfection" in prison than outside.[58]

### B.   Mr. Belton Has an Excellent Release Plan.

If Mr. Belton is released from custody, he will live with his mother and wife in their Oakland home.[59] This will allow him to quarantine and self-isolate, as well as receive medical treatment. Both his mother and wife have gloves and masks, and both have practiced social

---

[50] *Id*.
[51] *Id*. at *3.
[52] *Id*.
[53] *United States v. McCall*, 2020 WL 2992197, at *2 (M.D. Ala. June 4, 2020).
[54] *Id*. at *1.
[55] *United States v. Sholler*, 445 F. Supp. 3d 265, 271 (N.D. Cal. May 2020).
[56] *Id*. at 270.
[57] *Id*. at 266.
[58] *Id*. at 271.
[59] *See* Riser Decl.

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST
9

distancing since the pandemic began.[60]

### III. THE COURT HAS JURISDICTION TO REDUCE THE SENTENCE.

#### A. Statutory Framework for Sentence Reduction Authority under 18 U.S.C § 3582(C)(1)(a)(i).

The compassionate release statute grants courts authority to reduce a prison term for "extraordinary and compelling reasons."[61] Under the statute, "the court … upon motion of the defendant … [and] the lapse of 30 days from the receipt of such a request…, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), … if it finds that… extraordinary and compelling reasons warrant such a reduction…"[62] Thus, the requirements for reduction are that the court (1) find extraordinary and compelling reasons, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction reflects applicable policy statements.

#### B. The Court Can Consider Mr. Belton's Motion Because the Warden Did Not Respond to Mr. Belton's Request in 30 Days.

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons, Congress expanded the statute in the First Step Act of 2018.[63] As amended, § 3582(c)(1)(A)(i), now permits courts to consider motions filed by a defendant as long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden…, whichever is earlier[.]" Because the warden did not respond to Mr. Belton's request within the 30-day period, this Court has the authority to act.[64]

---

[60] *Id*.
[61] 18 U.S.C. § 3582(c)(1)(A)(i).
[62] § 3582(c)(1)(A).
[63] First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239.
[64] The 30-day lapse occurred before Mr. Belton's denial. Therefore, under the statute, the lapse triggers the Court's authority to act.

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

### C. Mr. Belton's Vulnerability to COVID-19 Is an Extraordinary and Compelling Reason.

"Despite their disagreements about the precise definition of 'extraordinary and compelling reasons' justifying compassionate release, many courts … have agreed that such reasons exist in cases involving defendants whose serious underlying health conditions place them at an elevated risk of infection and death from COVID-19..."[65] This stems from the fact that the compassionate release statute does not define or limit what is an "extraordinary and compelling" reason. Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common." Its definition of "compelling need" is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have ever experienced. Based on his significant pre-existing health conditions, Mr. Belton is among those most at risk of serious illness or death if he contracts the coronavirus for a second time or if his existing medical conditions worsen due to his exposure. Thus, the combination of circumstances provides a compelling reason for his immediate release.

Mr. Belton is within the CDC's High-Risk population for COVID-19[66] and the prison has already demonstrated a pattern of not treating its population,[67] including him. This unique and dire set of circumstances would constitute "extraordinary and compelling reasons" even before the First Step Act's passage. But now that the Court can determine what constitutes "extraordinary and compelling reasons," there is no reason why increased exposure to, and risk of fatality from, a pandemic would not qualify.

Therefore, in light of "the highly infectious nature of COVID-19, the limitations in a prison environment… on practicing the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission,"[68] and Mr. Belton's significant

---

[65] *United States v. Stephenson*, 2020 WL 2566760, at *5 (S.D. Iowa May 21, 2020).
[66] Risk for Severe COVID-19 Illness, *supra*.
[67] *See* Office of the Inspector Gen., U.S. Dep't Of Justice, *Review Of The Federal Bureau Of Prisons' Medical Staffing Challenges* (2016). In this report, the Inspector General found that chronic staffing shortages led to problems meeting prisoners' medical needs.
[68] *United States v. Resnick*, 451 F. Supp. 3d 262 (S.D.N.Y. 2020).

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

11

health issues, the Court should find that Mr. Belton's "legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release."[69]

### D. The Remaining Section 3553 Factors Favor Release.

When extraordinary and compelling reasons are established, as they are here, the Court must then consider the § 3553(a) sentencing factors to determine if reduction is appropriate.[70] When doing so, the Court should use the "most up-to-date picture" of the defendant's history and characteristics.[71] Here, the "most up-to-date picture" includes the COVID-19 pandemic and the serious risk it presents.

Evolving COVID-19 case law shows that courts have generously construed their discretion to effectuate Congressional intent to increase the use of compassionate release encouraged by the First Step Act. In *United States v. Arreola-Brteado*, the court explained that "courts have interpreted Congress's intent in passing the First Step Act, and specifically the amendment to § 3582(c)(1)(A), to have been to increase the use of compassionate release by entrusting the district courts with the discretion entrusted to the BOP..."[72] The court continued, reasoning "[i]ndeed, if inmates are now permitted to move for compassionate release even when the BOP disagrees, then it follows that Congress wanted to allow district judges to consider the vast variety of circumstances that may constitute extraordinary and compelling."[73] Significantly, courts weighing the § 3553(a) factors have granted release to those convicted of serious crimes with histories of violence because changed health circumstances, post-offense rehabilitation, and carefully crafted conditions of supervised release ameliorate concerns of public safety.

Ultimately, § 3553's sentencing purposes do not warrant a sentence that includes exposure to a life-threatening illness and possible death. As briefly outlined below, under the circumstances, the Court should conclude that Mr. Belton has already served enough time to sufficiently satisfy

---

[69] *Id.*
[70] 18 U.S.C. § 3582(c)(1)(A)(i).
[71] *Pepper v. United States*, 562 U.S. 476, 492 (2011).
[72] *United States v. Arreola-Brteado*, 445 F. Supp. 3d 1154, 1157–58 (S.D. Cal. 2020).
[73] *Id.* (internal quotations and citations omitted).

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

12

§3553's purposes.

### 1. Rehabilitation, Educational, and Vocational Opportunities

Even in the best of times, there are limited opportunities for rehabilitation in prison. Now, there are none, with prisoners locked down 22–23 hours per day and no programming available, including mental health treatment, substance abuse programs, coursework and family visitation.[74] For someone like Mr. Belton, who has taken a proactive approach to self-improvement, this is problematic, to say the least.

Further, the relevant 18 U.S.C. § 3553(a) sentencing factors favor granting compassionate release because Mr. Belton has made tremendous efforts at rehabilitation through courses and programming. These courses have allowed him to reflect upon his prior misconduct. More importantly, his release plan ensures a safe transition to the community where he can follow CDC guidelines to protect both himself and our community from the spread of COVID-19.

Before the pandemic and since his imprisonment, Mr. Belton completed several rehabilitation courses, including: 12 Hour Drug Abuse Program Drug Education Course; Anger Management Group; and Living Free Reentry Career Course.[75] These courses have given Mr. Belton the tools and resources necessary to react to circumstances in an appropriate, mature fashion. Indeed, Mr. Belton's family has "notice[d] and… talked about the level of patients [sic] he has gained since being incarcerated."[76] Mr. Belton's son, Saheed Glenn, elaborated on these changes, explaining that Mr. Belton "has also shown me a difference by holding himself accountable."[77]

In addition, Mr. Belton has enrolled and completed several classes, including classes on basic life skills, real estate, and history.[78] These classes and courses have taught Mr. Belton that he can support his family in a meaningful and legal way. Mr. Belton has shown by his conduct that

---

[74] Pandemic Report, *supra*.
[75] *See* Riser Decl., Ex. B, Certificates.
[76] *See* Riser Decl., Ex. H, Letters
[77] *Id*.
[78] *See* Riser Decl., Ex. D, Education Transcript.

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

13

he no longer poses a threat to public safety, and that granting him compassionate release would not endanger the community. For that reason, among the others discussed in this memorandum, Mr. Belton should be granted.

### 2. Changes to Draconian Sentencing Schemes Constitute Compelling and Extraordinary Reasons.

One of Mr. Belton's pending appellate issues concerns his convictions under the First Step Act.[79] In light of this, counsel will not address these issues in depth. However, it should be noted that other courts have found COVID-19 and subsequent changes to federal sentencing to constitute "extraordinary and compelling reasons." For example, in *United States v. Quinn*, the court observed that sentences imposed "under a far more draconian federal sentencing regime than exists today" may constitute compelling and extraordinary reasons.[80]

Moreover, the mere fact that the First Step Act is not retroactive "does not prohibit the court from considering this legislative change in deciding whether to reduce a defendant's sentence."[81] The reason? The Act's "amendments to the compassionate release process were explicitly aimed at empowering district courts to … conduct an individualized assessment of a defendant's case and approve a sentence reduction when warranted."[82] Further, the "Act's broader purpose is likewise consistent with allowing courts to consider such gross sentencing disparities, rather than forcing judges to interpret lack of retroactivity as a complete bar to relief based on subsequent changes to sentencing."[83]

### REQUEST FOR IMMEDIATE RELEASE

Mr. Belton is 48 years old, in very poor health, and has already battled the coronavirus.

---

[79] The Act amended the sentencing enhancements for prior offenses. Under the Act, a prior drug offense triggers a sentencing enhancement if that offense is a "serious drug offense." "Serious drug offense" means "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance … for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2). Under the Act, Mr. Belton has not suffered a conviction for a "serious drug offense" because none of his prior convictions had a maximum term of imprisonment of ten years. He is presently appealing on these grounds.
[80] *United States v. Quinn*, 2020 WL 3275736, at *2 (N.D. Cal. June 17, 2020)
[81] *Id*. at *3 (internal quotations and citation omitted).
[82] *Id*. at *4.
[83] *Id*.

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

Because of his rehabilitative efforts, he no longer poses a danger to the community. Yet he is at great risk *from* the community because he falls within multiple high-risk populations. Thus, his continued incarceration presents a greater danger to the public than would his release. Further, Mr. Belton already exhausted his administrative remedies at one of the most infected federal prisons in the country. In sum, Mr. Belton is precisely the type of inmate contemplated for release by the Attorney General's Memo related to early release.

## CONCLUSION

Mr. Belton asks the Court to grant his Motion to Impose Reduced Sentence pursuant to the First Step Act of 2018 and order his immediate release to home confinement.

Respectfully submitted,

DATED: October 8, 2020                                    /AER/

                                                          Ashley Riser
                                                          Counsel for Marcus Belton

MOTION TO REDUCE SENTENCE AND REQUEST FOR IMMEDIATE RELEASE
CASE NO. CR 14-030 JST

15