1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2

3   HALLIE HOFFMAN (CABN 210020)
    Chief, Criminal Division
4

5   THOMAS R. GREEN (CABN 203480)
    Assistant United States Attorney
6
        1301 Clay Street, Suite 340S
7       Oakland, California 94612
        Telephone: (510) 637-3680
8       FAX: (510) 637-3724
        thomas.green@usdoj.gov
9

10  Attorneys for United States of America

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                      OAKLAND DIVISION

14

15  UNITED STATES OF AMERICA,           )  Criminal Case No. 14-CR-00030-JST
                                        )
16              Plaintiff,              )  **UNITED STATES' OPPOSITION TO**
                                        )  **DEFENDANT'S MOTION FOR A REDUCTION**
17       v.                             )  **IN SENTENCE**
                                        )
18  MARCUS BELTON,                      )
                                        )
19              Defendant.              )
                                        )
20  _____    )

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

BACKGROUND.............................................................................................................1

I.     DEFENDANT'S CRIMINAL CONDUCT AND CRIMINAL HISTORY.........................1

     A.  The Charges, Conviction, and Sentence in This Case........................................1

     B.  Defendant's Prior Criminal History...................................................................2

     C.  Defendant's Numerous *Pro Se* Filings and the Denial of His Ninth Circuit Appeals and His Motion for Relief Pursuant to 18 U.S.C. section 2255...........................…...2

II.    DEFENDANT'S HEALTH CONDITION.................................................................3

     A.  Defendant's Health Condition Generally......................................…................4

     B.  Defendant's Treatment for COVID-19 and Recent Assertion of COVID Symptoms ....5

III.   DEFENDANT'S ADMINISTRATIVE REQUEST FOR RELEASE..............................6

IV.   BOP'S EFFORTS TO CONTAIN COVID-19 INFECTIONS........................................7

V.    COVID-19 INFECTIONS AT LOMPOC USP..........................................................9

VI.   BOP'S INCREASED USE OF HOME CONFINEMENT............................................9

ARGUMENT.............................................................................................................10

I.     THIS COURT HAS JURISDICTION TO MODIFY DEFENDANT'S SENTENCE.............10

II.    THIS COURT MAY NOT DESIGNATE DEFENDANT TO HOME CONFINEMENT.........10

III.   REDUCTION OF DEFENDANT'S SENTENCE IS NOT WARRANTED ......................11

     A.  Applicable law.......................................................................................11

     B.  But For Being a Danger to the Community and Section 3553(a) Sentencing Factors, the Government Does not Contest that Defendant's Health Conditions May Present an Extraordinary and Compelling Basis for Release...........................................15

     C.  This Court May Not Modify Defendant's Sentence Because He Is a Danger to Others....16

     D.  Section 3553(a) Factors Weigh Against Defendant's Release............................19

IV.   IF THIS COURT MODIFIES DEFENDANT'S SENTENCE, IT SHOULD DO SO WITH APPROPRIATELY RESTRICTIVE CONDITIONS...............................................21

CONCLUSION...........................................................................................................22

# **TABLE OF AUTHORITIES**

## **Cases**

*Reeb v. Thomas*, 636 F.3d 1224 (9th Cir. 2011) ....................................................... 10

*Tapia v. United States*, 564 U.S. 319 (2011) ........................................................... 10

*United States v. Ayon-Nunez*, 2020 WL 704785 (E.D. Cal. Feb. 12, 2020) ........................................... 14

*United States v. Baeza*, No. 18-0354-JST, Dkt. 59 ………………….....………………………… 16, 19

*United States v. Belton*, 694 Fed.Appx. 576 (9th Cir. 2017) ......................................................... passim

*United States v. Cazarez*, No. 15-CR-00362-CRB-1, Dkt. 78 (N.D. Cal. May 4, 2020)………………..12

*United States v. Ceballos*, 671 F.3d 852 (9th Cir. 2011) ........................................................... 10

*United States v. Chambliss*, 948 F.3d 691 (5th Cir. 2020) ....................................................... 20

*United States v. Daychild*, 357 F.3d 1082 (9th Cir. 2004)........................................................ 18

*United States v. Eberhart*, 2020 WL 1450745 (N.D. Cal. March 25, 2020) .................................... 12, 14

*United States v. Fobbs*, No. 19-CR-410 WHA, Dkt. 32 (N.D. Cal. Apr. 7, 2020)………………….....10

*United States v. Greenhut*, 2020 WL 509385 (C.D. Cal. Jan. 31, 2020).................................... 13

*United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008)................................................................ 19

*United States v. Johnson*, 16-00251-WHA, Dkt. 123 …………………….....………………….16, 19

*United States v. Jones*, No. CR 17-070 VC, Dkt. 93 (N.D. Cal. Apr. 10, 2020)…………………….....10

*United States v. Kelley*, 15-cr-00444-CRB-2, Dkt. 146 (N.D. Cal. May 27, 2020)…………………….13

*United States v. Mangarella*, 2020 WL 1291835 (W.D.N.C. Mar. 16, 2020)........................................ 14

*United States v. Pawlowski*, 967 F.3d 327 (3d Cir. 2020) ....................................................... 20

*United States v. Raia*, 954 F.3d 594 (3d Cir. 2020)................................................................. 14

United States v. Reid, No. 17-cr-00175-CRB-1, Dkt. 554 (N.D. Cal. May 5, 2020)…..………………11

*United States v. Shabudin*, No. 11-CR-00664-JSW-1, Dkt. 571 (N.D. Cal. May 12, 2020)…………..13

*United States v. Shayota*, No. 15-CR-00264-LHK-1, Dkt. 780 (N.D. Cal. May 26, 2020)……………..19

*United States v. Sprague*, 135 F.3d 1301 (9th Cir. 1998)....................................................... 13

*United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019).......................................................... 18

*United States v. Weidenhamer*, 2019 WL 6050264 (D. Ariz. Nov. 8, 2019) ........................................... 14

*United States v. Willingham*, 2019 WL 6733028 (S.D. Ga. Dec. 10 ....................................................... 12

*United States v. Zaragoza*, 2008 WL 686825 (N.D. Cal. Mar. 11, 2008) ................................................ 18

## Statutes

18 U.S.C. § 922(g) ............................................................................................................................ 1

18 U.S.C. § 924(c) ............................................................................................................................ 1

18 U.S.C. § 3142(g) ............................................................................................................. 11, 12, 16

18 U.S.C. § 3142(g)(1) .................................................................................................................... 17

18 U.S.C. § 3142(g)(3) .................................................................................................................... 18

18 U.S.C. § 3553(a) ........................................................................................................................ 19

18 U.S.C. § 3582(c)(1)(A) ................................................................................................. 10, 11, 15, 20

18 U.S.C. § 3621 .............................................................................................................................. 9

18 U.S.C. § 3624(c) ........................................................................................................................ 10

18 U.S.C. § 3624(c)(2) ...................................................................................................................... 9

18 U.S.C. § 3621(b) ........................................................................................................................ 10

18 U.S.C. §3624(c) ......................................................................................................................... 10

21 U.S.C. §§ 841(a)(1) ...................................................................................................................... 1

28 U.S.C. § 994(t) .......................................................................................................................... 11

28 U.S.C. § 2255 .............................................................................................................................. 2

34 U.S.C. § 60541(g) ....................................................................................................................... 9

## Rules

USSG § 1B1.13 .......................................................................................................................... passim

USSG § 1B1.13(2) ........................................................................................................................... 16

Defendant Marcus Belton is currently serving a 240-month sentence for his convictions for being a felon in possession of firearm, trafficking cocaine in a school zone, and arming himself in furtherance of his drug trafficking activities.  Defendant is serving his sentence at Lompoc United States Penitentiary ("USP Lompoc"), and has more than ten (10) years remaining on his sentence, based on an. an anticipated release date of May 9, 2031, assuming credit for good conduct.  Defendant seeks his immediate relief from his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  Dkt. 344.  The government opposes Defendant's motion.

## BACKGROUND

## I.    DEFENDANT'S CRIMINAL CONDUCT AND CRIMINAL HISTORY

### A.    The Charges, Conviction, and Sentence in This Case

In January 2014, a grand jury returned an indictment charging Defendant with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g).  (Dkt. 2.)  In November 2014, the grand jury returned a superseding indictment that added two counts of possession with intent to distribute cocaine base in or near a school, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 860, and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).  (Dkt. 86.)  The charges arose from an arrest by Oakland Police Officers ("OPD"), who observed Defendant conducting hand-to-hand drug transactions near an elementary school and discovered a loaded pistol in the waistband of his pants.   (Presentence Investigation Report ("PSR"), ¶¶ 3 and 6.)

Over the course of Defendant's case, he rejected four different court-appointed attorneys and ultimately represented himself at trial with the assistance of a fifth attorney serving as stand-by counsel. After a weeklong jury trial in June 2015, Defendant was convicted on all counts.  (Dkt. 98-100.)  In November 2015, this Court sentenced Defendant to 240 months' imprisonment and three years' supervised release.  (Dkt. 202.)  Defendant is presently serving his sentence at USP Lompoc, a medium security U.S. penitentiary in Lompoc, California, with a projected release date of May 9, 2031. https://www.bop.gov/inmateloc/.

### B.    Defendant's Prior Criminal History

Defendant has a lengthy criminal history that is detailed in the PSR, including ten criminal convictions prior to his convictions in this case, which include five felony convictions for drug sales and a prior felon in possession of a firearm conviction.  Defendant has been sentenced to numerous long sentences in the past, including four years for a federal drug crime and three year and eight year prison sentences for state drug crimes.  He has effectively either been incarcerated or on a form of supervision, with his subsequent criminal convictions reflecting he was often violating the conditions of his release, for the bulk of his adult life.

Defendant was also charged with murder and assault with a firearm stemming from a shooting in 1993.  The PSR reports that three eye witnesses identified defendant as the shooter in a photo lineup, but that they recanted their identifications, apparently out of fear, which resulted in the government dismissing the charges.  (PSR at ¶48).

### C.    Defendant's Numerous *Pro Se* Filings and the Denial of His Ninth Circuit Appeals and His Motion for Relief Pursuant to 28 U.S.C. Section 2255

On June 8, 2018, Defendant filed a 103-page motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence.  (Dkt. 263.)  On July 28, 2018, the Court ordered the Government to respond by August 13, 2018, and "show cause why relief should not be granted."  (Dkt. 267.)  On July 2, 2018, Defendant filed another 89-page § 2255 motion.  (Dkt. 269.)

In the meantime, Defendant's appeal of his conviction to the Ninth Circuit was pending.  (Dkt. 273 (Notice of Interlocutory Appeal).)  On July 10, 2017, the Ninth Circuit heard oral argument regarding the four purported errors.  (*United States v. Belton,* 694 Fed.Appx. 576 (9th Cir. 2017).)

Defendant's direct appeal was denied on all grounds.  On July 27, 2017, the Ninth Circuit issued its ruling and found: (1) "the district court did not abuse its discretion in denying Belton's various requests to continue the trial;" (2) "Belton forfeited the ability to challenge" the district court's ruling requiring that, "if he were to ultimately testify, he would be required to examine himself in question-and-answer format" because he "made no commitment to testify in the absence of the district court's ruling;" (3) the district court "did not plainly err or abuse its discretion in admitting evidence of Belton's

previous felonies;" and (4) the district court "did not error in denying Belton's motion to dismiss the superseding indictment for vindictiveness." (*Belton, supra,* 694 Fed.Appx. at 576.).[1]

On September 4, 2018, Defendant filed a 96-page amendment his section 2255 motion.  (Dkt. 279.)  On September 24, 2018, the Court issued an order granting Defendant's request to amend his filing "once as a matter of course because the United States has not yet served a responsive pleading." (Dkt. 281.)  The Court further held that "[a]ny further amendments will require the government's consent or leave of the Court."  (Dkt. 281.)  Due to "unclear" aspects of Defendant's prior filings, the Court set a new briefing schedule and ordered the Defendant to file "a single amended § 2255 containing all claims and arguments [Defendant] seeks to assert in support of his motion" by November 7, 2018.  (Dkt. 281.)  The Court further ordered the Government to respond by January 9, 2019.  (Dkt. 281.)  The deadline for Defendant's motion passed without any filing.

On January 1, 2019, Defendant filed a 185-page motion.  (Dkt. 288.)  In his late filing, Defendant alleges, among other unfounded assertions, that "numerous Constitutional deprivation[s] contributed" to his "fate" and an "evidentiary hearing" will show he was "not selling drugs" on the date in question but "waiting for his barber to arrive to give him a hair cut."  (Dkt. 288, p. 11.)

On September 26, 2019, the Court denied defendant's motion to vacate or set aside his conviction pursuant to section 2255.  (Dkt. 316).  Defendant filed a motion for reconsideration, which the Court denied.  (Dkt. 331).  Defendant also sought relief from the Ninth Circuit, and the Ninth Circuit issued a one page order denying defendant's petition and stating that no further filings will be accepted in this case.  (Dkt. 322).

## II.    DEFENDANT'S HEALTH CONDITION

Defendant recently turned 49 years old.  Defendant tested positive for coronavirus and recovered from the virus earlier this year.  He has a number of health conditions, described further below.

//

//

---

[1] On January 25, 2019, the Ninth Circuit denied Defendant's motion for clarification of the mandate and directed his filings to the district court.  (Dkt. 290.)

CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

3

1

**A.      Defendant's Health Condition Generally**

2      The PSR noted that Defendant advised that he had high blood pressure and suffered from

3 problems with his left leg from a prior gunshot wound.  (PSR at ¶61).  The PSR did not note that

4 Defendant had any other ongoing health conditions.  *Id.*  The PSR did not indicate that Defendant was

5 diabetic or suffered from chronic kidney disease, health conditions that BOP medical records reflect

6 were only diagnosed after he came into the care and custody of the BOP.

7      Defendant has been under the care of BOP medical professionals since his incarceration.  That

8 care has resulted in defendant being diagnosed and treated for a number of health care issues that had

9 not been diagnosed or treated prior to defendant being under the care of the BOP, including Type 2

10 diabetes and mild chronic kidney disease.  BOP medical records reflect an initial diagnosis of Type 2

11 diabetes mellitus, or adult onset diabetes, in August 2018, and other references to the diagnosis,

12 treatment and counseling of defendant regarding his diabetes on a regular basis since his diagnosis.  *See*

13 Defendant's Combined BOP Medical Records, attached as Exhibit 1 to the Declaration of Thomas R.

14 Green in Support of the United States' Opposition to Defendant's Motion for a Reduction in Sentence

15 ("Green Decl." at p. 2-3, 14, 17, 19, 21, 25-26, 39-41, 47, 79, 83, 101, 114 (please note that the page

16 numbers correspond with the page number of the pdf that comprises Exhibit A, e.g. page 17 of medical

17 records is the 17th page of the 190 page exhibit; or page 20 of the Green Decl. because the declaration

18 and Exhibit A cover sheet precede Exhibit A).[2]  Consistent with the regular medical care he has received

19 to address his diabetes, defendant last saw Dr. William Watson, MD, for testing, treatment and

20 counseling regarding his diabetes less than a week ago, on October 9, 2020.  *See id.* at p. 2-3.

21      The medical records also indicate that BOP doctors diagnosed defendant with chronic kidney

22 disease (stage 2 – mild) in December 2018, with it continuing to be addressed as a health issue on more

23 recent medical reports, including defendant being administered lab testing to measure the state of his

24 kidneys as recently as on October 1, 2020.  *See id.* at p. 47, 84, 100.

25

26

27      [2] Defendant's medical records are being filed in the public record with personal identifying
information redacted based on defense counsel authorizing such a public filing.

28 CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

1   The BOP medical records also reflect its regular treatment of defendant's high blood pressure,

2   more specifically diagnosed by the BOP as essential (primary) hypertension.  *See id*. at p. 21, 25-26, 34,

3   39-41, 47, 83-86.

4   **B.      Defendant's Treatment for COVID-19 and Recent Assertion of COVID Symptoms**

5   Consistent with defendant's assertion that he previously tested positive for the coronavirus, the

6   BOP medical records reflect defendant being diagnosed with COVID-19 and BOP's treatment of his

7   illness.  As referenced in defendant's moving papers, defendant was transferred to a local hospital

8   outside of the prison, Lompoc Valley Medical Center ("LVMC"), for treatment of the virus.  The BOP

9   medical records reflect that defendant was transferred to LVMC for treatment of his COVID symptoms

10   on April 7, 2020, when his temperature was measured at 102.4 degrees.  *See id*. at p. 47-50.  On April

11   15, 2020, defendant reported that he "had no complaints, and state[ed] he feels generally improved."  It

12   appears that Defendant remained at LVMC for observation until April 14 or April 20, 2020.  *See id*. at p.

13   25, 28 and 78.  BOP health services evaluated Defendant on April 27, 2020, at which time defendant

14   "had no complaints of [shortness of breath], cough, difficulty breathing or any other signs or symptoms

15   of SARS_COV-2 (COVID-19)."  *See id.* at 22.  Defendant had "no medical complaints at the time."  *See*

16   *id*.  Defendant's COVID-19 diagnosis was considered resolved as of May 11, 2020.  *See id*. at p. 85-87.

17   Defendant asserts in his motion that he has recently experienced COVID-19-like symptoms.[3]

18   His medical records reflect that he complained about the same in a phone call to his family in late

19   September 2020, which appears to have caused BOP staff to inquire as to whether he was experiencing

20   symptoms or needed any treatment.  When BOP Health services inquired with Defendant as to his

21   condition, Defendant denied having any symptoms, and told staff he was "sick of being here."  Depicted

22

23

---

24   [3] Defendant's motion also asserts that the BOP has "ignored" his complaints of COVID
    symptoms and even "threatened him with a 'write up'" if he persisted in asserting he was experiencing

25   COVID symptoms.  *See* Dkt. 344 at 5-6 and 8; Dkt 344-1 at ¶¶ 7 and 12.  Efforts to verify whether
    defendant's complaints have been ignored or tamped down in any fashion are described in an email from

26   BOP counsel to the undersigned AUSA, which is attached as Exhibit B to the Green Decl.  The medical
    records referenced in this opposition brief also belie defendant's claim that the BOP has ignored his

27   health generally, or any complaints of COVID symptoms in September 2020.

28   CR 14-00030 JST
    GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

below are relevant portions of the clinical encounter note describing defendant's denial of COVID-19

symptoms on September 25, 2020:

## Clinical Encounter - Administrative Note

Inmate Name: BELTON, MARCUS Reg #: 98903-011

Note Date: 09/25/2020 21:19 Unit: F02

Admin Note - General Administrative Note encounter performed at Health Services.
Administrative Notes:
ADMINISTRATIVE NOTE 1 Provider: Ortiz, Roberto NRP-EMT

> Per Custody Staff, while monitoring inmate Belton's phone calls, the inmate was noted to have complained of recent "COVID-19 Symptoms".

> When questioned the inmate denied any symptoms or acute illnesses.
> Inmate denied all COVID-19/Flu-Like symptoms and did not appear to be in any distress.

> The inmate repeatedly replied "I am sick of being here".

Copay Required:No Cosign Required: Yes
Telephone/Verbal Order: No
Completed by Ortiz, Roberto NRP-EMT on 09/25/2020 21:23
Requested to be cosigned by Souferzadeh, Navid MD.
Cosign documentation will be displayed on the following page

*See id.* at 12.

BOP health services assessed Defendant's condition again on September 28, 2020, at which time

he reported chest pain and shortness of breath when laying down and reiterated that he was "tired of

being here." *See id.* at 7-9.  Defendant's vital signs were checked.  He "presented in no apparent

distress/pain" and reported that his symptoms were an ongoing issue when lying down, stating:  "My

chest does not hurt right now, and I have no respiratory issues at the moment." *See id.*  Defendant

denied all COVID-19 symptoms, including fever, chills, dizziness or loss of smell and taste. *See id.*  An

EKG was performed and a physical assessment was performed that was otherwise unremarkable.  "Clear

bilateral lung sounds" were noted.  *See id.*

## III.     DEFENDANT'S ADMINISTRATIVE REQUEST FOR RELEASE

The exhibits filed in support of Defendant's motion reflect that Defendant, with the assistance of

counsel, submitted a request for compassionate release to the Warden of Lompoc Federal Correctional

1    Complex ("FCC") on August 14, 2020, which the government accepts at face value for purposes of

2    Defendant's motion.  *See* Exhibit C to Defendant's Motion.

3    **IV.    BOP'S EFFORTS TO CONTAIN COVID-19 INFECTIONS**

4           As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many

5    deaths in the United States in a short period of time and that has resulted in massive disruption to our

6    society and economy.  In response to the pandemic, BOP has taken significant measures to protect the

7    health of the inmates in its charge.  BOP has explained that "maintaining safety and security of [BOP]

8    institutions is [BOP's] highest priority."  BOP, Updates to BOP COVID-19 Action Plan: Inmate

9    Movement (Mar. 19, 2020), at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

10          BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division,

11   Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

12   https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.  That protocol is lengthy and detailed,

13   establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a

14   "[s]uspected human outbreak overseas." *Id*. at i.  The plan addresses social distancing, hygienic and

15   cleaning protocols, and the quarantining and treatment of symptomatic inmates.

16          Consistent with that plan, BOP began planning for potential coronavirus transmissions in

17   January.  At that time, the agency established a working group to develop policies in consultation with

18   subject matter experts in the Centers for Disease Control, including by reviewing guidance from the

19   World Health Organization.  On March 13, 2020, BOP began to modify its operations, in accordance

20   with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID- 19

21   transmission into and inside its facilities.  Since that time, as events require, BOP has repeatedly revised

22   the Action Plan to address the crisis.

23          Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently

24   governs operations.  The current modified operations plan requires that all inmates in every BOP

25   institution be secured in their assigned cells/quarters, in order to stop any spread of the disease.  Only

26   limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate

27   commissary, laundry, showers, telephone, and computer access.  Further, BOP has severely limited the

28   CR 14-00030 JST
     GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

movement of inmates and detainees among its facilities.  Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease.  Likewise, all official staff travel has been cancelled, as has most staff training.

BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encouraged them to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff.  Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.  In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone.  A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems.  All volunteer visits are suspended absent authorization by the Deputy Director of BOP.  Any contractor or volunteer who requires access will be screened for symptoms and risk factors.  Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month.  Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols.

As of the filing of this opposition brief, there are 125,905 inmates in BOP-managed institutions and 14,365 in community-based facilities.  BOP has 122 institutions. https://www.bop.gov/locations/. BOP's Covid-19 testing data, and COVID-19 case data, is available down to the individual facility level on the BOP website, which is updated daily.  Across all facilities, as of the filing of this brief, BOP has completed COVID-19 tests for 64,214 inmates, with another 1,831 pending results, reflecting the

1  systematic ongoing nature of testing performed.  Of these, there have been 15,910 positive tests, with

2  126 inmate deaths and two BOP staff member deaths attributed to COVID-19.  Further details and

3  updates of BOP's modified operations are available to the public on the BOP website at a regularly

4  updated resource page: www.bop.gov/coronavirus/index.jsp.

5  **V.    COVID-19 INFECTIONS AT LOMPOC USP**

6          Not a single inmate is presently positive for the coronavirus across the two correctional

7  institutions at Lompoc, Lompoc USP where defendant is housed, and Lompoc FCI.  *See*

8  https://www.bop.gov/coronavirus/.  Seven staff members are presently considered positive and

9  quarantined from others, four of whom work at Lompoc USP.  *See id*.  Lompoc was one of the BOP

10 facilities that was severely impacted by the coronavirus earlier in the year, with 150 inmates who tested

11 positive at Lompoc USP who have recovered and 734 inmates at Lompoc FCI who tested positive and

12 have since recovered.  Sadly, four of the nearly 900 inmates across the entire Lompoc facility who tested

13 positive for the virus did not survive it.  *See id*.  It appears that the majority of inmates at the facility

14 have been tested for the virus, with the BOP reporting that it has conducted more than 1700 tests across

15 the two facilities, with six results presently pending.  *See id*.

16 **VI.   BOP'S INCREASED USE OF HOME CONFINEMENT**

17         In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to

18 the disease and pose the least threat to the community, BOP is exercising greater authority to designate

19 inmates for home confinement.  On March 26, 2020, the Attorney General directed the Director of the

20 Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to

21 prioritize the use of statutory authority to place prisoners in home confinement.  That authority includes

22 the ability to place an inmate in home confinement during the last six months or 10% of a sentence,

23 whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and

24 terminally ill inmates specified in 34 U.S.C. § 60541(g).

25         Congress has also acted to enhance BOP's flexibility to respond to the pandemic.  Under the

26 Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen

27 the maximum amount of time for which the Director is authorized to place a prisoner in home

28 CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

1   confinement" if the Attorney General finds that emergency conditions will materially affect the

2   functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C.

3   § 3621 note).  On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise

4   this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus

5   transmission.

6           As of this filing, BOP has transferred an additional 7,796 inmates to home confinement in

7   response to the virus.  *See* https://www.bop.gov/coronavirus/.

8                                    **ARGUMENT**

9   **I.      THIS COURT HAS JURISDICTION TO MODIFY DEFENDANT'S SENTENCE**

10          The United States accepts that Defendant sought administrative review of his request that he be

11  released on or around August 15, 2020.  More than thirty days have elapsed since August 15, 2020;

12  consequently, this Court has jurisdiction to review Defendant's motion on the merits.  *See* 18 U.S.C. §

13  3582(c)(1)(A).

14  **II.     THIS COURT MAY NOT DESIGNATE DEFENDANT TO HOME CONFINEMENT**

15          Only the BOP, pursuant to its exclusive authority under 18 U.S.C. § 3624(c), can designate

16  where Defendant serves his existing custodial sentence.  The BOP has exclusive authority to determine

17  the location where an inmate serves his or her custodial sentence, including whether transfer from a

18  secure facility to home confinement is more appropriate for a particular defendant.  *See Tapia v. United*

19  *States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary

20  control, subject to statutory constraints, over [the place of imprisonment and treatment programs].");

21  *United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (per curiam) ("The Bureau of Prisons has

22  the statutory authority to choose the locations where prisoners serve their sentence."); *Reeb v. Thomas*,

23  636 F.3d 1224, 1226 (9th Cir. 2011) ("Congress delegated to the BOP the duty to manage and regulate

24  all federal penal and correctional institutions.").  Although this Court may make a non-binding

25  recommendation to BOP as to home confinement, BOP's designation decision "is not reviewable by any

26  court."  18 U.S.C. §§ 3621(b) & 3624(c); *see, e.g.*, *United States v. Jones*, No. CR 17-070 VC, Dkt. 93

27  (N.D. Cal. Apr. 10, 2020) (denying defendant's motion for compassionate release but recommending

28  CR 14-00030 JST
    GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

1  BOP place defendant in home confinement); *United States v. Fobbs*, No. 19-CR-410 WHA, Dkt. 32

2  (N.D. Cal. Apr. 7, 2020) (recommending BOP place defendant in home confinement).

3         Thus, to the extent Defendant is requesting that the Court order BOP to designate his home as the

4  location for his incarceration, the Court is without power to do so.

5  ## III.     REDUCTION OF DEFENDANT'S SENTENCE IS NOT WARRANTED

6         This Court may reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) only if, "after

7  considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court

8  "finds that" either "extraordinary and compelling reasons warrant such a reduction," or the defendant is

9  at least 70 years old and has served at least 30 years in prison, "and that such a reduction is consistent

10 with applicable policy statements issued by the Sentencing Commission." *See United States v.*

11 *Robinson*, No. 18-CR-00597 RS, Dkt. 33 (N.D. Cal. Apr. 27, 2020).  Moreover, this Court may not

12 reduce defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other

13 person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13.

14 ### A.    Applicable law

15        This Court may only reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) if, "after

16 considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court

17 "finds that" either "extraordinary and compelling reasons warrant such a reduction," or the Defendant is

18 at least 70 years old and has served at least 30 years in prison, "and that such a reduction is consistent

19 with applicable policy statements issued by the Sentencing Commission." *See, e.g.*, *United States v.*

20 *Reid*, No. 17-cr-00175-CRB-1, Dkt. 554 (N.D. Cal. May 5, 2020); *United States v. Robinson*, No. 18-

21 CR-00597 RS, Dkt. 33 (N.D. Cal. Apr. 27, 2020).[4]

22        Even if defendant's health or age qualifies as extraordinary and compelling basis for release, the

23 policy statement of the Sentencing Commission precludes defendant's release if he is considered a

24

---

25 [4]  Congress explicitly gave authority to the Sentencing Commission to further describe what conduct
would authorize a court to order a compassionate release.  Specifically, 28 U.S.C. § 994(t) states that the

26 Sentencing Commission "shall describe what should be considered extraordinary and compelling
reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of

27 specific examples."  The statute also states that "[r]ehabilitation of the Defendant alone shall not be
considered an extraordinary and compelling reason."  28 U.S.C. § 994(t).

28 CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

danger.  The pertinent policy statement is set forth at United States Sentencing Guidelines ("USSG")

§ 1B1.13.  It prohibits this Court from reducing a Defendant's sentence unless the Court determines that

"the Defendant is not a danger to the safety of any other person or to the community, as provided in

18 U.S.C. § 3142(g)."  *See United States v. Cazarez*, No. 15-CR-00362-CRB-1, Dkt. 78 (N.D. Cal. May

4, 2020) (denying compassionate release claim due to danger).[5]

The Sentencing Commission also provided explicit examples of what constitutes an

"extraordinary and compelling circumstance":

(A)     **Medical Condition of the Defendant.**—

    (i)     The Defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii)     The Defendant is—

        (I)     suffering from a serious physical or medical condition,

        (II)     suffering from a serious functional or cognitive impairment, or

        (III)     experiencing deteriorating physical or mental health because of the aging process,

    that substantially diminishes the ability of the Defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)     **Age of the Defendant** — The Defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment; whichever is less.

(C)     **Family Circumstances.** —

    (i)     The death or incapacitation of the caregiver of the Defendant's minor child or minor children.

---

[5]  While district courts disagree about whether the First Step Act alters the binding nature of USSG § 1B1.13, "the limited statutory exceptions to the general rule of finality of judgment" counsels in favor of following the Sentencing Commission's guidance, as one judge of this Court recently did when faced with a similar motion.  *United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. March 25, 2020); *see also United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (collecting cases).

CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

1
2

> (ii)    The incapacitation of the Defendant's spouse or registered partner when the Defendant would be the only available caregiver for the spouse or the registered partner.

3

USSG § 1B1.13 cmt. n.1.[6]

4
5

Thus, in order to qualify for compassionate release after having exhausted his or her

6

administrative remedies with the Bureau of Prisons, a Defendant must be able to demonstrate one of the

7

listed reasons in (A)–(C) above. *See United States v. Kelley*, 15-cr-00444-CRB-2, Dkt. 146 (N.D. Cal.

8

May 27, 2020). Defendant bears the burden to show special circumstances meeting the high bar set by

9

Congress and the Sentencing Commission for compassionate release to be granted. *See United States v.*

10

*Shabudin*, No. 11-CR-00664-JSW-1, Dkt. 571 (N.D. Cal. May 12, 2020); *United States v. Greenhut*,

11

2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that Defendant bears the burden of

12

establishing entitlement to sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301,

13

1306-07 (9th Cir. 1998)).

14

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition,

15

Defendant first must establish that his condition falls within one of the categories listed in the policy

16

statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any

17

"serious physical or medical condition . . . that substantially diminishes the ability of the Defendant to

18

provide self-care within the environment of a correctional facility and from which he or she is not

19

expected to recover." USSG § 1B1.13 cmt. n.1(A). If a Defendant's medical condition does not fall

20

within one of the categories specified in the application note (and no other part of the application note

21

applies), his or her motion must be denied.

22

---

23

[6] Application Note 1(D), the final example listed by the Sentencing Commission, is inapplicable to this situation. *See United States v. House*, No. 14-cr-00196-CRB-1, Dkt. 2202 at 4 n.2 (N.D. Cal. May 20, 2020) (holding (D) inapplicable even in light of the COVID-19 pandemic). It provides as follows: "**Other Reasons.** — As determined by the Director of the Bureau of Prisons, there exists in the Defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." USSG § 1B1.13 cmt. n.1. In turn, BOP promulgated Program Statement 5050.50, amended effective January 17, 2019, to set forth its own internal criteria for evaluating compassionate release requests. *See* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. In this case, the Director of BOP did not identify any "extraordinary and compelling reason" under this application note.

24
25
26
27
28

CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

The existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not by itself fall into either of those categories and therefore could not alone provide a basis for a sentence reduction.[7]  As Chief Judge Hamilton recently held in this district, "General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. §1B1.13."  *United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. March 25, 2020); *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (Third Circuit holding that the existence of COVID-19 alone does not constitute a basis for granting compassionate release).  The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population.

Nor would a Defendant's chronic but manageable underlying medical condition, alone, constitute "extraordinary and compelling" circumstances.  *See United States v. Arceo*, No. 09-CR-00616-EJD-1, Dkt. 86 (N.D. Cal. May 22, 2020) ("[T]he mere fact that Defendant suffers from chronic conditions is insufficient [for compassionate release].").  Indeed, before the outbreak of COVID-19, district courts addressing § 3582(c)(1)(A) claims routinely noted:  "To be faithful to the statutory language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant suffers from . . . chronic conditions that [he] is not expected to recover from.  Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release."  *United States v. Ayon-Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release from a Defendant suffering from severe back injuries and epilepsy) (quoting *United States v. Weidenhamer*, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)).  Compassionate release is "rare" and "extraordinary" and courts routinely deny such claims.  *See Arceo*, No. 09-CR-00616-EJD-1, Dkt. 86 (noting

---

[7]  Indeed, it is reported that some inmates are *trying* to contract COVID-19 in the hopes that it will enable them to get released from prison.  *See* https://www.washingtonpost.com/nation/2020/05/12/inmates-coronavirus-infect-los-angeles/ (inmates in LA county jail have attempted to infect themselves with COVID-19 in order to be released).

1   compassionate release is rare); *United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C.

2   Mar. 16, 2020) ("[A] compassionate release . . . is an extraordinary and rare event." (citation omitted)).

3         But the combination of an inmate's chronic medical condition and the risk of contracting

4   COVID-19 in a custodial setting may constitute an extraordinary and compelling reason to grant a

5   motion under 18 U.S.C. § 3582(c)(1)(A), where COVID-19 and an inmate's medical condition would

6   not individually suffice.  If an inmate has a chronic medical condition that has been identified by the

7   CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[8] that condition—that

8   combination with the likelihood that a Defendant may contract COVID-19 while incarcerated and suffer

9   severe symptoms as a result—may constitute a "serious" medical condition "from which [the

10   Defendant] is not expected to recover," which "substantially diminishes the ability of the Defendant to

11   provide self-care within the environment of a correctional facility."  USSG § 1B1.13 cmt. n.1(A)(ii)(I).

12   But as part of its analysis of the totality of circumstances, the Court should also consider whether the

13   inmate is more likely to contract COVID-19 if he or she is released than if he or she remains

14   incarcerated.  That will typically depend on the inmate's proposed release plans and whether a known

15   outbreak is occurring at his or her institution.

16
17
     **B.**     **But For Being a Danger to the Community and Section 3553(a) Sentencing Factors, the Government Does not Contest that Defendant's Health Conditions May Present an Extraordinary and Compelling Basis for Release.**

18

19         In this case, Defendant has asserted that he suffers from hypertension, Type 2 diabetes and

20   chronic kidney disease, among other health conditions, which he argues make him more vulnerable to

21   becoming seriously ill should he contract COVID-19.  The government has obtained medical records

22   from BOP that corroborate Defendant's assertion that he suffers from such conditions.  Type 2 diabetes

23   and chronic kidney disease are among the conditions identified by the CDC on its website, last updated

24   on October 6, 2020, as increasing a person's risk for developing serious illness from COVID-19.

25

26
27
[8]  *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at*
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified July 17, 2020).

28   CR 14-00030 JST
  GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

1  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

2  conditions.html.  Though defendant's hypertension, and possibly his kidney disease, which is described

3  as mild in the medical records, may fall short individually of rising to the level of placing defendant at

4  greater risk, the combination of defendant's health conditions appear to place defendant among the

5  cohort of persons identified by the CDC as facing greater risk than the general population.

6          The government has weighed the impact of defendant's prior recovery from COVID-19 in

7  responding to Defendant's motion.  In a vacuum, the fact that defendant has already contracted and

8  recovered from COVID-19, without suffering severe symptoms or death, cuts against the notion that his

9  conditions present an extraordinary and compelling reason for his release.  The fact that the BOP

10  provided him with medical care to successfully treat the virus, including transporting him to a local

11  hospital for at least one week of treatment and observation, also supports a conclusion that the BOP is

12  well equipped to provide defendant with any care he may require.  In fact, it was not until defendant was

13  in BOP care that he was diagnosed with the health conditions that he now argues warrant his release.

14  The medical records reflect that he has received regular care for all of the health conditions identified

15  and diagnosed by the BOP, including efforts by the BOP to understand any complaints of COVID

16  symptoms he may have communicated to his family or lawyers.

17          However, the government is aware generally that the scientific community is still assessing the

18  extent to which a person who has previously recovered from COVID-19 still may be vulnerable to the

19  potentially deadly consequences of the virus.  As such, the United States is not prepared to contest that

20  the combination of Defendant's health conditions may present an extraordinary and compelling basis for

21  Defendant's release, but for the fact that Defendant remains a danger and the sentencing factors of

22  section 3553(a) have not been met.

23          **C.      This Court May Not Modify Defendant's Sentence Because He Is a Danger to
24                    Others.**

25          This Court may not reduce Defendant's sentence unless it finds that "the Defendant is not a

26  danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

27  USSG § 1B1.13(2).  *See United States v. Baeza*, No. 18-0354-JST, Dkt. 59 (denying compassionate

28  CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

1   release on danger and section 3553(a) grounds for a defendant convicted of cocaine trafficking and felon

2   in possession of a firearm); *United States v. Johnson*, 16-00251-WHA, Dkt. 123 (denying

3   compassionate release on account of danger where defendant had been convicted of drug trafficking and

4   felon in possession of a firearm); *see also Cazarez*, No. 15-CR-00362-CRB-1, Dkt. 78 (denying

5   compassionate release claim due to danger); *United Sates v. Cazares*, No. 18-cr-00466-BLF-1, Dkt. 351

6   (N.D. Cal. Apr. 23, 2020) (concluding, in the pre-trial detention context, that "the balancing of the

7   factors does not warrant [Defendant's] release [because he] continues to pose a serious risk to the safety

8   of the community, and that risk overrides [Defendant's] concerns that he might contract COVID-19 at

9   [local jail].").  This record precludes such a finding.

10         Defendant's motion does not address the requirement that the Court determine defendant is not a

11   danger to the community before releasing him.  However, under § 3142(g), the Court must consider four

12   factors in determining whether the Defendant might present a danger:  (1) the nature and circumstances

13   of the offense charged; (2) the weight of the evidence against the Defendant; (3) the history and

14   characteristics of the Defendant, including the Defendant's character, physical and mental condition,

15   family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and

16   record concerning appearance at court, and (4) the nature and seriousness of the danger to any person or

17   the community that would be posed by the person's release.  18 U.S.C. § 3142(g)(1)–(4).  Consideration

18   of these factors—which are not affected by COVID-19—does not allow this Court to conclude that

19   Defendant is not a danger to the safety of any other person or the community.

20         The first factor to be considered is "the nature and circumstances of the offense charged,

21   including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of

22   terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive

23   device."  18 U.S.C. § 3142(g)(1).  Defendant's crimes involved both a controlled substance (cocaine

24   distribution) and a firearm (section 922(g) anmd 924(c) counts), which defendant possessed to further

25   his cocaine trafficking efforts.

26

27

28   

Worse, defendant pursued his armed cocaine dealing activities near a school.  The nature and circumstances of defendant's crimes are dangerous on their face, and the Court's 240 month sentence reflects the Court's prior conclusion that Defendant is a danger.

Defendant's motion pays short shrift to the inherent danger of his criminal activity, barely acknowledging the full scope of his conduct.  In fact, the words armed, firearm, and gun cannot be found in Defendant's motion.  Nor is the word "school" referenced in his brief.  Instead, Defendant's moving papers simply list the statutes of his conviction, minimize his behavior, and argue that federal sentencing of drug crimes are "draconian," again without reference to Defendant arming himself near a school in furtherance of his drug trade.

The Court must also consider Defendant's history and characteristics.  18 U.S.C. § 3142(g)(3).  Prior to his conviction in this case, Defendant already had a lengthy criminal history, with ten criminal convictions prior to his convictions in this case, including five felony convictions for drug sales and a prior felon in possession of a firearm conviction.  The evidence demonstrates that defendant has been living a criminal life for the bulk of his adult life.  When not incarcerated, he has committed new crimes while under a form of supervision.

Finally, the Court must consider the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  Defendant brought his armed drug trafficking into a school area.  Having suffered five prior convictions for drug dealing, Defendant is hard pressed to argue that he is no longer a danger.  In fact, with prior sentences as long as eight years, Defendant has demonstrated that substantial prison terms were not sufficient for him to curb his dangerous activity.

The COVID-19 pandemic does not reduce Defendant's danger to others.  The danger posed to the community by firearms and drug offenses has been well-established.  *See United States v. Daychild*, 357 F.3d 1082, 1100 (9th Cir. 2004) (approving detention on danger prong due to Defendant's possession of firearms and stating that "danger posed to the public by armed conspirators who traffic in illicit drugs is too plain to permit dispute."); *see also United States v. Torres*, 911 F.3d 1253, 1264 (9th Cir. 2019) (Congress passed Section 922(g) to "disarm groups whose members Congress believes are unable or unwilling to conduct themselves in conformity with the responsibilities of citizenship"

CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

1  (internal quotation marks omitted)); *United States v. Zaragoza*, 2008 WL 686825, at *3 (N.D. Cal. Mar.

2  11, 2008) (Spero, J.) ("In assessing danger, physical violence is not the only form of danger

3  contemplated by the statute.  Danger to the community can be in the form of continued narcotics activity

4  or even encompass pecuniary or economic harm.").

5      In the current climate, irresponsible social habits can also endanger the health of the community.

6  *United States v. Hir*, 517 F.3d 1081, 1088 (9th Cir. 2008) (holding that "community," within the

7  meaning of 18 U.S.C. § 3142, is not necessarily confined to local geography).  Many Bay Area residents

8  are currently or may in the future be under orders to shelter in place.  Such rules, though enforced by

9  peace officers, rely largely on voluntary compliance.  A person who ignores such admonitions and rules

10  could increase infection rates, leading to severe illness and death.  Defendant has shown an

11  unwillingness or inability to follow rules based on his repeated possession of loaded firearms while

12  engaged in drug trafficking, and a disregard for the welfare of others.  His failure to follow rules poses

13  particular dangers to the community.  Releasing Defendant from his detention, and adding him back into

14  the general population, is antithetical to the concept of sheltering-in-place.

15      Defendant has not shown that his current medical condition or risk of COVID-19 (a risk that

16  applies in the community as well) makes him less of a danger.  The defense presents no additional facts

17  that meaningfully shift the balance of the § 3142(g) factors in Defendant's favor.  In sum, Defendant has

18  failed to demonstrate that the § 3142(g) factors the Court considered at the time of detention have

19  changed, and thus the Court should deny Defendant's motion for immediate release.

20  **D.    Section 3553(a) Factors Weigh Against Defendant's Release.**

21      Finally, any compassionate-release decision—even for a statutorily eligible Defendant—must

22  also consider the factors under 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A)(i).  Numerous

23  courts in this district, including this Court, have denied compassionate release motions where section

24  3553(a) sentencing objectives had not been achieved, even upon ruling or assuming that defendant's

25  health circumstances constituted a compelling and extraordinary basis for release.  *See Baeza*, No. 18-

26  0354-JST, Dkt. 59 (denying motion where defendant had approximately 54 months remaining on his

27  original sentence, not taking any good conduct credit into account); *see also Johnson*, 16-00251-WHA,

28  CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

Dkt. 123 (denying compassionate release where defendant had approximately 45 of his 94 month sentence remaining, not taking any good conduct credit into account); *United States v. Shayota*, No. 15-CR-00264-LHK-1, Dkt. 780 (N.D. Cal. May 26, 2020) (denying compassionate release for a defendant who had approximately 81 months remaining on his original sentence, not taking any good conduct credit into account).

The section 3553(a) factors—which this Court already considered when imposing Defendant's sentence—do not support his request for a premature, permanent release.  The law, and the specific facts of Defendant's case, neither demand nor endorse that result.

Even assuming defendant receives full credit for good time served, and will be released on May 9, 2031, defendant still has approximately 127 months remaining on his sentence.  He has served only thirty-five percent (35%) of his sentence, or nearly forty percent (40%) of his sentence assuming defendant ultimately receives full credit for good time served.  As this Court and others have found, the length of time remaining on a defendant's sentence is an appropriate consideration for determining whether to reduce a sentence under 18 U.S.C. § 3582(c)(1)(A). *See United States v. Pawlowski*, 967 F.3d 327, 330–31 (3d Cir. 2020); *see also United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (holding the district court did not abuse its discretion in holding the § 3553(a) factors did not warrant release where defendant had served less than half his sentence, even though the defendant's medical condition qualified as an extraordinary and compelling circumstance).  Here, defendant's low percentage of his sentence served, reflected in facing more than ten more years in prison assuming credit for good time served, weighs strongly against release.

While the government may argue that serving so little of one's sentence is generally insufficient to achieve the objectives of section 3553(a), defendant's moving papers do not reflect that defendant has genuinely come to terms with the full nature of his criminal activity and the danger it presented to the community.  Defendant's exhaustive appeals and section 2255 motion have failed, yet his motion makes reference to yet further appellate efforts driven by a perception that he has been wrongfully subject to draconian laws that punish drug dealers.

CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

With so much time remaining on his sentence, there is substantial reason to conclude that none of the objectives of sentencing described in section 3553 have been met.  He has not been provided with sufficient education, training and time necessary to change his behavior.  The public is not safe from his further bad acts.  And being released more than ten years early would not reflect the seriousness of his conduct and criminal history, conduct and criminal history his motion barely addresses.

If Defendant is rewarded with his release following his crimes, more than ten years early, Defendant will have every reason to conclude that he will not face serious consequences for his future bad acts, whether they be violent, or as benign as failing to wear a mask in public.

The Court cannot make a determination regarding Defendant's risk of either acquiring or further transmitting COVID-19 in the community, as compared to the risk in custody.  The current numbers at USP Lompoc reflect that the virus is under control at the facility, with not a single case among the prison population at either USP Lompoc of FCI Lompoc.

## IV.     IF THIS COURT MODIFIES DEFENDANT'S SENTENCE, IT SHOULD DO SO WITH APPROPRIATELY RESTRICTIVE CONDITIONS

If the Court is inclined to grant Defendant's motion for compassionate release, this Court should substitute a term of probation or supervised release with a condition of home confinement for a number of years and at least until the coronavirus no longer poses a threat, and a term of supervised release with conditions as ordered by the Court at Defendant's original sentencing hearing, to last at least until his projected release date of May 9, 2031.  Defendant has served just over a third of his sentence.  The government submits that releasing Defendant outright would not appropriately re-balance the § 3553(a) factors of this case, particularly given that the present conditions caused by the pandemic are likely impermanent—public reporting indicates that various medical professionals globally are in the process of developing a vaccine and researching other methods of combatting the disease in the coming months. *See, e.g.*, https://www.nih.gov/news-events/news-releases/nih-clinical-trial-investigational-vaccine-covid-19-begins.

In order to minimize risks to public health, the government also respectfully requests that the Court (1) order any release only after Defendant's release and travel plans are in place, and (2) set any

CR 14-00030 JST
GOV. OPP. TO DEF. MOT. FOR RELEASE FROM CUSTODY

release 14 days from the date of its order to accommodate BOP's ability to quarantine Defendant prior

to his release to protect the community from potential further spread.

## CONCLUSION

Defendant remains a danger to others and the sentencing goals of section 3553 have not been met

only with more than ten years remaining on his sentence.  This Court should deny Defendant's motion

for immediate release under 18 U.S.C. § 3582(c)(1)(A)(i).

DATED:  October 16, 2020                                   Respectfully submitted,

                                                          DAVID L. ANDERSON
                                                          United States Attorney

                                                          _/s/ Thomas R. Green_
                                                          THOMAS R. GREEN
                                                          Assistant United States Attorney